# EXHIBIT 1

11/19/2024 4:54 PM   Matthew Johnson

Cathy M. Garrett   WAYNE COUNTY CLERK

23-000164-CD FILED IN MY OFFICE

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

WAFA AL-HADWAN,
an individual,
                    Plaintiff,

-vs-                                          Case No.: 23-000164-CD
                                              Hon.: Brian R. Sullivan

HAMTRAMCK PUBLIC SCHOOL DISTRICT,
a Municipal Corporation, and
NABIL NAGI, in his individual and official capacity,

                    Defendants.

| | |
|---|---|
| ELDER BRINKMAN LAW, PLLC<br>Azzam Elder (P53661)<br>1360 Porter St, Suite 250<br>Dearborn, MI 48124<br>T. (313) 429-1326 / F (313) 202-9548<br>aelder@elderbrinkmanlaw.com<br><br>RJ LANDAU PARTNERS, PLLC<br>Richard J. Landau (P42223)<br>Attorney for Def Nabil Nagi<br>5340 Plymouth Road, Suite 200<br>Ann Arbor, MI 48105<br>(734) 369-5850<br>Rjlandau@rjlps.com | CLARK HILL PLC<br>ANNE-MARIE V. WELCH (P70035)<br>ROBERT N. DARE (P79207)<br>Attorney for Defendants<br>151 South Old Woodward Avenue, Suite 200<br>Birmingham, MI 48009<br>awelch@clarkhill.com<br>rdare@clarkhill.com<br>Tel.: (248) 988-1810 |

**PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND**

> **This case arises out of the same occurrence as alleged in the Complaint between the Defendants (but not Plaintiff) involving some of the same subject matter of this Case which is assigned to Judge Brian Sullivan, Case No. 22-015301-CD**

Plaintiff, WAFA AL-HADWAN, an Individual, by and through her undersigned counsel,

Azzam Elder, Elder Brinkman Law, PLLC, and for her First Amended Complaint against,

HAMTRAMCK PUBLIC SCHOOL DISTRICT (HPS), a Municipal Corporation, NABIL NAGI, in his individual and official capacity, hereinafter states as follows:

## PARTIES AND JURISDICTION

1.    At all times relevant herein, Plaintiff WAFA AL-HADWAN (hereinafter "Plaintiff" and "MS. AL-HADWAN"), was, and currently is, an individual residing in the County of Wayne, State of Michigan.

2.    Plaintiff was hired by Hamtramck Public School District (HPS) in July 2022 as the Human Resource Specialist and served as a Data Analyst at HPS since October 2021, prior to receiving the Human Resources Specialist role. Plaintiff has a bachelor's degree and met all the requirements for the job description.  Defendant Nagi signed the paperwork.

3.    Plaintiff was hired by the Interim Superintendent Mr. Nabil Nagi.

4.    Upon information and belief, at all times relevant herein, Defendant, Hamtramck Public School District (hereinafter "HPS"), was, and currently is, a Municipal Corporation, that did, and currently does business in Wayne County, Michigan, with its registered office located at 3201 Roosevelt Street, Hamtramck, 48212 Wayne County, Michigan.

5.    Defendant, HPS, is a Michigan general powers school district within the meaning of Michigan's Revised School Code, M.C.L. §§ 380.1, et seq. The Hamtramck Schools is in the City of Hamtramck, Wayne County, Michigan.

6.    HPS is a "public school employer" within the meaning of Michigan's Public Employee Relations Act (PERA), M.C.L. §§ 423.201,et seq.

7.    Upon information and belief, at all times relevant herein, Defendant NABIL NAGI, (hereinafter "NAGI," "Defendant Nagi"), was, and currently is, an individual residing in the City of Dearborn, Wayne County, the State of Michigan, and at all times relevant herein was employed by Defendant HPS as the Interim Superintendent.

8.    Upon information and belief, at all times relevant herein, the Board of Directors (hereinafter "Board of Directors"), were and currently are, individuals residing in the State of Michigan, and in the city of Hamtramck, and at all times relevant herein are employed and elected to serve as Board of Trustees on the HPS.

9.    Jurisdiction and venue of this instant action is proper as all of the events giving rise to this instant action occurred in Wayne County, Michigan.

10.    Jurisdiction and venue in this Honorable Court are proper as the amount in controversy is more than Twenty-Five Thousand ($25,000) Dollars, exclusive of costs, interest, and attorney fees.

## BACKGROUND INFORMATION
## AND GENERAL ALLEGATIONS

11.    Plaintiff hereinafter incorporates by reference the above stated Paragraphs and allegations therein as though fully set forth herein.

12.    Upon information and belief, as further set forth and pled herein, the factual allegations provide relevant background information, provide a basis, and are compelling evidence.

13.    HPS is responsible for educating approximately 3,300 students in grades kindergarten through 12.

14.    Approximately 79% of the students in the Hamtramck Schools are not proficient in reading according to the State of Michigan.

15.    Approximately 81% of the students in the Hamtramck Schools are not proficient in math according to the State of Michigan.

16.    HPS promoted Nabil Nagi to the position of Interim Superintendent of Schools in the fall of 2021.

17. In 2022, Plaintiff discovered a book that appeared inappropriate and pornographic for students. Plaintiff brought it to the attention of Defendants. Plaintiff engaged in protected activity by speaking up about parental rights and the need to protect students from potentially inappropriate content. On August 11, 2022, Plaintiff was present during a discussion regarding sexually explicit content disguised as appropriate LGBTQ books in the common area at the Central Office. She expressed how some content could be seen as offensive. Shortly after, on August 15, 2022, Plaintiff was falsely accused of reporting these books as inappropriate. This accusation circulated across the office, resulting in harassment, defamation, and further undermining Plaintiff's position. Plaintiff sought the administration's intervention in addressing these defamatory rumors, which they failed to do, thereby contributing to a hostile work environment and retaliatory actions against her for exercising her right to raise concerns about parental and student rights.

18. Defendant Nagi and his inner circle team, Heather Dorogi, Anne Clemente, Widad Luqman and others worked to please the union President Toni Coral and attempted to exclude parents from providing guidance on the types of books students should have access to.

19. Defendants retaliated against Plaintiff and blamed Plaintiff for the eventual public outcry by parents who discovered Defendant Nagi, and his staff had approved certain books that were completely inappropriate and pornographic.

20. Since early 2022, Plaintiff tried to get Defendant Nagi to quash rumors being spread by employees about her.

21. For months, Defendant Nagi refused to stop the rumors and continued to dissuade Plaintiff from taking any action against ill-willed employees.

22. Despite being made aware by Plaintiff of specific false rumors spread by his personal secretary, Janell Meyers, and other employees, Defendant Nagi refused to take any action to stop these rumors. These rumors specifically accused Plaintiff of engaging in an extramarital affair with a fellow employee, which was intended to attack her chastity and reputation as a married woman within the Yemeni community. Plaintiff informed Nagi of the dates these rumors were circulated, the specific individuals involved, and how these false statements were causing her severe distress and harm to her reputation, yet Nagi failed to intervene, perpetuating a work environment where Plaintiff was subjected to discrimination and harassment based on her gender, national origin, and religion.

23. Defendant's personal secretary, Janell Meyers, was one of the main violators flaming the false rumors.

24. Defendant would make comments to Plaintiff and others about her Yemeni background and how, as a female, she was vulnerable to rumors that could get out in the community and compromise her safety and destroy her family. Defendant Nagi was aware of the severe implications of these rumors and the harm they would cause to Plaintiff.

25. Plaintiff did her best to seek help and protection from Defendant Nagi who refused to take any action to help.

26. Plaintiff filed a complaint with the Office of Civil Rights on October 7, 2022. Plaintiff reported to the Board instances of discriminatory conduct against older women, violations of laws designed to protect students with disabilities, and the need to prevent the circulation of potentially inappropriate and pornographic books. Specifically, in her emails to the Board of Education on October 7, 2022, Plaintiff documented ongoing retaliation, age and disability discrimination, and unethical practices within the administration. Plaintiff had

attempted to address these issues through proper channels, including her Title IX request, but faced resistance and retaliation, culminating in her feeling isolated and unsupported within her workplace .

27. Defendant Nagi was also trying to promote certain employees and in the process discriminated against other female employees.

28. Defendant Nagi was advised by Plaintiff that his actions were violations of hiring practices and unethical.

29. Plaintiff raised concerns and complained numerous times to the board of education and HR.

30. Defendant Nagi then got upset when the Board of Directors did not approve of his personnel changes.

31. Defendant Nagi began to accuse Ms. Al-Hadwan of lobbying against his wishes with her relative who sits on the Board.

32. Defendant Nagi became upset and expressed his displeasure to Plaintiff, who felt intimidated and reported this to her HR Director.

33. Defendant Nagi began to flex his authority to show he was not interested in anyone who expressed constructive feedback and wanted everyone to listen to his directives.

34. Around September 5, 2022, a female employee named Amra Poskovic emailed Plaintiff a complaint because she was discriminated against by Defendant Nagi when she was bypassed for a promotion when Defendant Nagi told her that she did not get the promotion because he preferred the younger candidate with less family obligations.

35. Around September 8, 2022, another female employee named Marjana Maros emailed Plaintiff to complain about discrimination she encountered from Defendant Nagi when he

made it clear he preferred younger female employees as opposed to older employees who have more family obligations like Maros.

36.    In a retaliatory act, on or about September 9, 2022, Defendant Nagi reassigned the offices of HR department employees, including Plaintiff, without prior notice or justification, and allocated these spaces to newly appointed staff members aligned with his interests. This office reassignment was publicly announced during a staff meeting, with Nagi making derogatory comments implying that the HR department was being 'downsized' due to incompetence. This action was intended to and did cause humiliation to Plaintiff and her colleagues, further creating a hostile work environment. Other employees like Anne Clemente and others were treated better because they unconditionally supported the HPS agenda and actions to discriminate, retaliate, and break laws intended to protect students and their families.

37.    Around September 9, 2022, Defendant Nagi sent an email changing the interview and hiring processes to gain more control over the process.

38.    Around the same time period, Defendant Nagi retaliated against Maros and Poskovic by humiliating them for filing their complaints with HR.

39.    Around September 12, 2022, Maros sent an official complaint for retaliation and discrimination by Defendant Nagi.

40.    During this time period, HR Director Elhady continued to try and get Defendant Nagi to stop his inappropriate behavior, and explained to him that he must follow the laws and regulations.

41.    Defendant Nagi took this advice as unsupportive of his decisions.

42.     Elhady also explained to Defendant Nagi that he cannot make decisions based on age, sex, family orientation, etc. and informed him of the accusations that were being made by some individuals. Plaintiff experienced a discriminatory environment influenced by age bias within the administration. On September 5, 2022, Amra Poskovic filed a formal complaint alleging age discrimination, stating that younger, less qualified employees were being prioritized over older, experienced staff. Similarly, on September 8, 2022, Marijana Maros filed a complaint that described how she was bypassed for a promotion due to a preference for younger employees. These complaints highlight an administration practice of favoring younger employees while disregarding the experience and contributions of older workers. Plaintiff shared similar concerns with the administration, which contributed to the overall hostile work environment she faced.

43.      Defendant Nagi was upset with the complaints being filed against him and wanted revenge.

44.     Around October 3, 2022, after giving Defendant Nagi time to cool off, HR Director Elhady set up a meeting with Defendant Nagi to get things back on track. Defendant Nagi initially agreed but canceled at the last minute.

45.     By this time, the HR department was being bombarded with complaints from employees against Defendant Nagi and some of his top aides and favored employees. Therefore, Director Elhady reported these problems that she viewed as discriminatory conduct within the workplace based on age, sex, family orientation, etc. to President Salah Hadwan of the School Board and expressed an urgency to stop the violations of law.

46.     Director Elhady recommended that an investigation needed to be conducted on Defendant Nagi for the allegations of discrimination.

47. Around October 4, 2022, a meeting was called with Board President Salah Hadwan. Present at the meeting was Ms. Al-Hadwan, Hiba Mesto, Mahssin Harp, and HR Director Elhady. This meeting addressed the normalized culture of discrimination, retaliation, harassment, and outward racism throughout the district and the many complaints regarding these instances that Mr. Nabil Nagi failed to address throughout the year.
   Plaintiff expressed concerns about the discriminatory actions and retaliation.

48. After the discussion, President Hadwan told everyone that he will be recommending an external investigator be hired to investigate the discrimination, harassment, and racism allegations.

49. At this point, Defendant Nagi was aware that Director Elhady and Plaintiff had reported the discriminatory action he had taken against several female employees and an investigation was coming.

50. On October 5, 2022, Director Elhady went to visit principal Vickie Smith at her school building because she wanted to discuss her discrimination complaint against Defendant Nagi without making it obvious by coming to the central office.

51. Unbeknownst to Director Elhady, Defendant Nagi was watching him, and he even followed him to the school where he made a scene.

52. Defendant Nagi demanded that the HR Director immediately leave the building and not meet with Vickie Smith.

53. Defendant Nagi accused HR Director Elhady of being insubordinate.

54. The HR Director informed Plaintiff that he took in the complaint from Mrs. Smith and that she complained to him about age discrimination that she has suffered from Defendant Nagi,

and about Nagi's continuing violation of laws and regulations designed to protect students with learning disabilities that Defendant Nagi wanted Mrs. Smith to cover up for him.

55.   Defendant Nagi was upset about the HR department, including Plaintiff, for refusing to support Nagi in his retaliatory ways towards employees who did not support him.

56.   Plaintiff witnessed Defendant Nagi become resentful towards her when she refused to support his unethical hiring practices.

57.   When HR Director Elhady went back to the central office, Defendant Nagi immediately placed him on leave.

58.   Defendant Nagi called the police on the HR Director and humiliated him and had him escorted out of the building.

59.   The President of the Board of Directors tried to stop Defendant Nagi's retaliation, but Defendant Nagi's power trip had gone to his head and he was using his powers to retaliate against anyone who filed a complaint against him, acting beyond the scope of his role and authority.

60.   Defendant Nagi continued with his retaliation when he unilaterally eliminated the HR department by placing both HR employees on leave to stop any investigation of him.

61.   Defendant Nagi continued with his retaliation against the other female employees who filed complaints against him for discrimination by taking actions to humiliate them and aim to have a "quiet firing", hoping that they would quit.

62.   On September 9, 2022, Plaintiff sent an email to Defendant Nagi giving him an ultimatum to stop the rumors being spread from his front office with the help of his aides.  In this communication, Plaintiff clearly informed Defendant Nagi that she will file a Title IX complaint about the harassment and defamatory rumors if they did not cease. This email

provided Defendant Nagi with direct and unequivocal notice of Plaintiff's intent to engage in protected activity.

63. Defendant saw Plaintiff in the office of the Title IX coordinator on September 13, 2022. This observation provided Defendant Nagi with direct knowledge that Plaintiff was engaging in protected activity

64. Defendant Nagi interfered and coerced the situation by stopping Director Iman Harp, Title IX coordinator, from taking a complaint from Plaintiff.

65. In a deliberate act to undermine Plaintiff's credibility and position, Defendant Nagi unilaterally appointed his close aide, Heather Dorogi, to the Title IX Coordinator role on September 15, 2022. Concurrently, Nagi instructed Dorogi to file a baseless complaint accusing Plaintiff and the HR Director of engaging in unethical conduct related to hiring practices, which included false accusations of document tampering and favoritism. These accusations were circulated in an internal memo on September 16, 2022, and were intended to discredit Plaintiff, harm her professional reputation, and deflect from the ongoing investigations into Nagi's own misconduct.

66. On October 12th, 2022, Plaintiff spoke at the Board of Education public meeting, addressing the discrimination, racism and harassment against minorities throughout the district and pleading for the support of the Defendant HPS.

67. On October 13th, 2022, the very next morning after the Plaintiff's public speech, Defendant Nagi then put in motion a retaliatory investigation of Plaintiff in an attempt to cause a "quiet firing" by using HPS videos he had improperly obtained to threaten Plaintiff and her family as a means of coercion and blackmail.

68.    On October 17, 2022, Defendant Nagi placed Plaintiff on administrative leave based on false allegations claiming that she accessed unauthorized personnel files and used them to retaliate against Heather Dorogi because of the Title IX investigation against Plaintiff.

69.    Following Plaintiff's placement on administrative leave on October 17, 2022, Defendant Nagi escalated his retaliatory actions by fabricating and filing false allegations against Plaintiff. Specifically, on October 20, 2022, Nagi alleged that Plaintiff had engaged in an inappropriate sexual relationship with another employee, despite no evidence suggesting such behavior. These allegations were presented in written form to the school board and used as a basis to further tarnish Plaintiff's reputation and justify her continued suspension, all of which were part of Nagi's ongoing campaign of retaliation against Plaintiff for her earlier complaints about discriminatory practices.

70.    Defendant Nagi and HPS leadership covered up the illegal actions done by HPS, Nagi, and his inner cabinet including Anne Clemente, Hearther Dorogi, and others.

71.    Defendant Nagi's conduct and actions, which were meant to silence his victims, are shocking and intentional and are beyond the scope of his role and authority. Defendant Nagi made these false statements with actual malice, intending to harm Plaintiff's reputation and discredit her within her professional and Yemeni community. As a direct result of these defamatory statements, Plaintiff has suffered significant harm, including damage to her professional reputation, emotional distress, and humiliation.

72.    Defendant Nagi's friend and Title IX coordinator, Heather Dorogi, publicly released to news sources, community pages, and the entire district, details of the Federal Title IX investigation which she was entrusted to keep confidential. This was designed to publicly shame and humiliate Plaintiff in the defense and support of Defendant Nagi. Included in

her disparaging details of the investigation were high praises for Defendant Nagi. Plaintiff had not been interviewed or informed of the completion of the investigation and only learned about its bias conclusion online.

73. Heather Dorogi admits to working closely and maintaining a friendship with Defendant Nagi, who appointed her the Title IX role so that investigation conclusions always fall in his favor.

74. Anne Clemente and others also attacked Plaintiff to discredit her because they needed to cover up their unlawful conduct raised against them.

75. Many other co-conspirators of Defendant Nagi also released letters and statements to the public which included confidential investigation details disparaging Plaintiff in support of Defendant Nagi. Defendants allowed this public shaming and harassment to continue for many months.

76. It was also discovered that Defendant Nagi, acting beyond the scope of his role and authority, had collected video surveillance of Plaintiff, which he tried to use to coerce and intimidate Plaintiff by making false accusations to shame her in the Yemeni community.

77. Defendant Nagi, acting beyond the scope of his role and authority, with the help of HPS, created a false and baseless investigation of Plaintiff instead of stopping Defendant Nagi's violations and retaliation. This retaliatory action was taken immediately after Plaintiff's complaint, establishing a direct causal connection between her protected activity and the adverse employment actions taken by Defendants.

78. The retaliatory investigation put in motion by Defendant Nagi and HPS created a hostile work environment, and sexual harassment against Plaintiff.

79.   The retaliatory investigation was aimed to continue to fan the flame of false rumors of an inappropriate relationship attacking Plaintiff's chastity, integrity, and honor.

80.   During the investigation that was put in motion by Defendant Nagi and HPS, it was discovered that Defendant Nagi in his perverted way had been surveilling Plaintiff and unlawfully collected videos and photos of Plaintiff without her consent.

81.   With the knowledge of some Board members, as the Interim Superintendent, Defendant Nagi was saving such videos and photos for months in his office. He was plotting to use them one day to extort or blackmail Plaintiff and to get her to submit to his wishes or quit out of fear of being shamed by him.

82.   Defendant Nagi provided these videos and photos to the hired investigators.

83.   Defendant Nagi also had third parties deliver threatening messages to Plaintiff and her family to convince her to back down and quit her job or "some video would be released."

84.   Defendant Nagi and HPS have failed to produce the videos or investigation reports as required when an employee seeks copies of their personnel records.

85.   More importantly, NO evidence exists of any wrongdoing by Plaintiff. It is Defendant Nagi's perverted backwards thinking that allowed him to use innocent work circumstances as a means of retaliation and leverage.

86.   HPS allowed their agents to spread the rumors designed to slander and hurt Plaintiff by Defendant Nagi.

87.   HPS was faced with investigations that supported firing Defendant Nagi however the board delayed taking corrective action for over one year in an effort to buy time and find a way to help Defendant Nagi.

88.  When the HPS board determined that they must follow the investigation recommendations and terminate Nagi, they began to fabricate new evidence to justify also firing Plaintiff as a way to further punish and humiliate her.

89.  The continued retaliation and work harassment changed the conditions of employment making it difficult to enforce the HR mandates. HPS targeted Plaintiff by unethical increased scrutiny, diminished job security, and the erosion of her professional reputation. These actions created a hostile work environment designed to pressure Plaintiff into compliance or resignation.

90.  HPS targeted Plaintiff and others because of their close association as whistleblowers. They changed the superintendents, attorneys, and others to enact further retaliation and revenge against all of the whistleblowers including Plaintiff.

91.  HPS new Chair Jihan Aiyash worked for over one year to assist Nagi and she refused to follow the investigation recommendations to terminate him.  She used her authority to isolate Superintendent Jaleelah Ahmad who she recently blocked from returning to work after Ms. Ahmad insisted on following the investigators recommendations.  She also fired the long-time district attorney who made the same recommendation, which was to fire Nagi and reinstate Plaintiff immediately. On March 14, 2024, Defendants sent Plaintiff a letter of "Non-renewal."

92.  However, prior to this, Defendants had their attorney send Plaintiff a draft letter for reasons for termination that accused her of sexual misconduct.  HPS leadership was using backwards cultural tactics that they knew could ruin marriages and put Plaintiff's life in danger.  Such tactics were not used against other HPS employees.  After reviewing the

draft letter from HPS with malicious and false accusation, Plaintiff's counsel threatened to sue anyone involved in attacking Plaintiff's character and chastity.

93.    The draft letter sent by HPS attorneys was malicious and false, causing mental and emotional harm to Plaintiff and her family.

94.    Defendants then fabricated other reasons for non-renewal/termination that are factually contradictory and false.

95.    Defendants failed to produce any evidence prior to the April 24, 2024, public hearing.

96.    Defendants accused Plaintiff of unauthorized access to personal files of Heather Dorogi, and for retaliation.

97.    Defendants intentionally lied and fabricated these allegations because they were aware that their own investigation concluded that it was Defendant Nagi who used the Title IX Coordinator position as a means of retaliation in addition to other findings that support this complaint.

98.    During the time that Plaintiff was wrongfully placed on administrative leave, HPS has continued to retaliate against her by refusing to follow the investigators recommendation that advised that she should be reinstated. Instead, HPS leadership fabricated further false allegations to justify their wrongful actions

99.    Defendants intentionally scheduled the Non-renewal of Plaintiff at the same time Defendant Nagi was scheduled to be terminated to further humiliate her.

100.   Defendants aimed to humiliate a Yemeni lady from the community and allowed Defendant Nagi to make slanderous public comments that are against HPS policies.

101.   During Defendant Nagi's public speech, he specifically named Plaintiff numerous times and provided details about confidential investigations and humiliating matters. HPS Board

members never interrupted Defendant Nagi's speech to enforce established practices of not mentioning specific names in public speeches and only referring to titles.

102.   Defendant Nagi regularly interrupted past public speeches when employee names were specifically mentioned and was well aware of decorum before he made his speech disparaging Plaintiff by name.

103.   Defendants allowed Defendant Nagi to continue to slander Plaintiff publicly in front of the entire community, without regards to her physical safety and wellbeing.

104.   Defendant HPS and Nagi retaliated and took actions to:

      a.      Silence Plaintiff;

      b.      Falsely accuse Plaintiff;

      c.      Retaliate against Plaintiff;

      d.      Improperly suspend Plaintiff;

      e.      Discriminate against Plaintiff;

      f.      Lie about Plaintiff;

      g.      Intimidate Plaintiff

      h.      Harass Plaintiff

      i.      Coerce Plaintiff;

      j.      Shame Plaintiff;

      k.      Violated Plaintiff's religious modesty;

      l.      Humiliate Plaintiff;

      m.      Wrongfully and constructively placed Plaintiff on leave; and

      n.      Wrongfully terminate Plaintiff.

**COUNT I**

**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**MCL 37.2101, et seq – RETALIATION & WORKPLACE HARASSMENT**

105.   Plaintiff hereinafter incorporates all of the above referenced allegations as though fully set forth herein.

106.   At all times relevant herein, Plaintiff was an employee of Defendant HPS within the meaning of the ELCRA.

107.   At all times relevant herein, Defendant HPS was Plaintiff's employer covered by and within the meaning of the ELCRA.

108.   At all times relevant herein, Defendant Nagi was employed by Defendant HPS or was otherwise an agent or representative of Defendant HPS as defined under the ELCRA.

109.   The ELCRA prohibits retaliation against any person because the person has opposed a violation of law under the ELCRA, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under the ELCRA. MCL 37.2701(a).

110.   Plaintiff engaged in an activity protected under the ELCRA when she reported the discriminatory conduct, retaliation, and hostile environment to which she witnessed numerous female and minority employees be subjected to discrimination and retaliation by Defendant Nagi, as outlined above. For example, Plaintiff spoke up about Nagi and his discrimination against other female and minority employees, and about parent rights when the HPS administration was bypassing parents and exposing students to pornographic content in books. Plaintiff also was harassed and retaliated against because of her close association with other whistleblowers interfering with her ability to do her job. The harassment and retaliation altered the work environment and tainted the work environment by harassment altering the terms and conditions of employment.

111. Plaintiff was part of a protected class and was engaged in protected activity, and was subject *associational* retaliation when reprisal taken by an employer against Plaintiff when she and other victims were engaged in protected conduct.

112. Defendant Nagi has demonstrated a predisposition to discriminate against female employees because of their age, marital status, religion, national origin, and sex.

113. After Plaintiff engaged in her protective activity as outlined above, when she opposed violations under ELCRA, when she filed a complaint against Defendant Nagi for violating the ELCRA, when she assisted other victims of Defendant Nagi who are protected under the ELCRA, when she participated in investigation, proceedings, and hearings of Defendant Nagi violating the ELCRA. Plaintiff was subjected to severe or pervasive retaliatory harassment by Defendant Nagi as outlined above and in this complaint.

114. Defendant Nagi attempted to coerce, intimidate, threaten, or interfere with Plaintiff's duties and responsibilities as the HR Specialist.

115. The adverse employment actions or severe and pervasive retaliatory harassment that Plaintiff endured was the direct result of Plaintiff's protected activity under Act.

116. This severe and pervasive retaliatory harassment and the adverse employment actions taken against Plaintiff by Defendants, all of which are further set forth above, included, but were not limited to:

   a. On October 13th, 2022, Defendant Nagi retaliated against Plaintiff by launching a Title VII and Title IX complaint against Plaintiff;

   b. Defendant Nagi continued his retaliation by placing Plaintiff on leave, disparaging false allegations and humiliating Plaintiff and attacking Plaintiff's reputation; and

c.  Defendant Nagi set up retaliatory investigations of Plaintiff to preempt and distract any investigations of his violations of law, attempts at unethical hiring practices, and the retaliation of multiple employees who courageously spoke out against the harassment, racism, disclination, retaliation culture at HPS.

d.  Defendant HPS continued to retaliate against Plaintiff by fabricating reasons that would eventually be used to terminate Plaintiff.

117.  As a direct and proximate cause of Defendants' unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, torment, humiliation and embarrassment, constant paranoia of being watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and owing at the time of trial, in addition to compensatory damages, plus court costs, statutory interest and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT II
## VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT
## MCL 37.2101, et seq – DISCRIMINATION BASED ON SEX, RELIGION, AND NATIONAL ORIGIN

118.  Plaintiff hereinafter incorporates all of the above referenced allegations as though fully set forth herein.

119.   At all times relevant herein, Plaintiff was an employee of Defendant, HPS within the meaning of the ELCRA.

120.   At all times relevant herein, Defendant HPS was Plaintiff's employer covered by and within the meaning of the ELCRA.

121.   At all times relevant herein, Defendant Nagi was employed by Defendant HPS or was otherwise an agent or representative of Defendant HPS as defined under the ELCRA.

122.   The ELCRA prohibits retaliation against any person because the person has opposed a violation of law under the ELCRA, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under the ELCRA. MCL 37.2701(a).

123.   Plaintiff engaged in an activity protected under the ELCRA when she reported the discriminatory conduct, retaliation, and hostile environment to which she witnessed numerous female employees be subjected to discrimination and retaliation by Defendant Nagi, as outlined above.

124.   Defendant Nagi, discriminated against Plaintiff and other victim employees on the basis of her protected class as a female, and also targeted her because of Plaintiff's religion (Muslim) and national origin (Yemeni background).

125.   Defendant Nagi has demonstrated a predisposition to discriminate against female employees because of their age , religion, national origin, and sex.

126.   Plaintiff attempted to stand up against such discrimination and was punished for doing so.

127.   Defendants and Defendant Nagi used extortionist tactics, black mail tactics, intimidation tactics, and he used sexual harassment to bolster his retaliation against Plaintiff by allowing false rumors of affairs, by using video surveillance as a false means to file a sexual

harassment complaint, to terrorize and intimidate Plaintiff and Plaintiff's family. Defendants Nagi and HPS created a hostile work environment based on false sexual accusations to hurt Plaintiff in violation of the ELCRA. And used Plaintiffs marital status, national origin, religion, and gender to threaten, retaliate, and intimidate in violation of the ELCRA.

128. After Plaintiff engaged in her protective activity as outlined above, when she opposed violations under ELCRA, when she attempted to file a title IX complaint for failing to stop a sexually hostile work environment, but was blocked by Defendant Nagi (Defendants failed to take prompt and adequate remedial action), when she filed a complaints against Defendant Nagi for violating the ELCRA, when she assisted other victims of Defendant Nagi who are protected under the ELCRA, when she participated in investigation, proceedings, and hearings of Defendant Nagi violating the ELCRA. Plaintiff was subjected to severe or pervasive retaliatory harassment by Defendant Nagi as outlined above and in this complaint.

129. Defendant Nagi attempted to coerce, intimidate, threaten, or interfere with Plaintiff's duties and responsibilities as the HR Specialist.

130. The adverse employment actions or severe and pervasive retaliatory harassment that Plaintiff endured was the direct result of Plaintiff's protected activity under Act.

131. This severe and pervasive retaliatory harassment and the adverse employment actions taken against Plaintiff by Defendants, all of which are further set forth above, included, but were not limited to:

   a.    On October 13th, 2022, Defendant Nagi retaliated against Plaintiff by launching a Title VII and Title IX complaint against Plaintiff;

b.  Defendant Nagi continued his retaliation by placing Plaintiff on leave, disparaging false allegations and humiliated and attack Plaintiff's reputation;

c.  Defendant Nagi set up retaliatory investigations of Plaintiff to preempt and distract any investigations of his violations of law, attempts at unethical hiring practices, and the retaliation of multiple employees who courageously spoke out against the harassment, racism, disclination, retaliation culture at HPS; and

d.  Defendant Nagi targeted Plaintiff by manipulating and discriminating against her by trying to force a "quite firing" by accusing her of an extramarital affair, of security breaches, and other false accusations, in a malicious manner to silence her because she is a female Muslim who was married with a family from the Yemeni community, so that he believed he can harass, intimidate, pray on and destroy.

e.  Defendant HPS continued their retaliation when they refused to follow the investigation recommendation to allow Plaintiff to be reinstated. Defendant HPS instead worked to fabricate false reasons to terminate and humiliate Plaintiff because of her protected activities.

132.  As a direct and proximate cause of Defendants' unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, torment, humiliation and embarrassment, constant paranoia of being watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and owing at the time of trial, in addition to compensatory damages, plus court costs, statutory interest and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT III
## WHISTLEBLOWER PROTECTION ACT

133. Plaintiff repeats and re- alleges each and every preceding paragraph as if fully set forth herein.

134. At all material times, Plaintiff was an employee, and Defendants HPS was her employer, covered by and within the meaning of the Whistleblowers' Protection Act, MCL 15.361 et seq.

135. Plaintiff's actions were protected activities and Plaintiff was part of a protected class.

136. Defendants violated the Whistleblowers' Protection Act when they discriminated against Plaintiffs as described regarding the terms, benefits, conditions, and privileges of their employment because Plaintiffs reported a violation or suspected violation of a law, regulation, or rule of the State of Michigan, or Federal Government, and opposed practices made illegal by the laws, regulations, or rules of the State of Michigan, and Federal Law.

137. Plaintiff reported Defendant Nagi's violations of law to the School Board, the EEOC, the OCR, and to the HR department. Plaintiff reported Defendant Nagi's violations of law to the School Board many times from September 14, 2022 through October 17th 2022, detailing specific incidents of illegal discrimination and retaliation, including the manipulation of hiring practices and retaliation against employees who filed complaints. Plaintiff also submitted reports to the OCR on October 7, 2022, which was transferred to

the EEOC on December 22, 2022, where she outlined how Defendant Nagi's actions violated Title VII and other anti-discrimination laws. This reporting directly preceded the adverse actions taken against her.

138.  Plaintiff reported and spoke up against Defendants' discriminatory conduct towards females, older woman, violations of laws designed to protect students with disabilities, and the need to prevent pornographic books.

139.  The actions of Defendants were intentional.

140.  As a direct and proximate result of Defendants' unlawful actions against Plaintiff as described, Plaintiff has sustained injuries and damages, including, but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, torment, humiliation and embarrassment, constant paranoia of being watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and owing at the time of trial, in addition to compensatory damages, plus court costs, statutory interest and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT IV
## SLANDER & FALSE LIGHT

141.  Plaintiff hereinafter incorporates all of the above referenced allegations as though fully set forth herein.

142.  For months, Plaintiff sought the help of Defendant Nagi to get his secretary and his other aides to stop spreading rumors about her having an inappropriate relationship.

143.  Defendant Nagi was quietly encouraging the rumors and found them entertaining, controlling and empowering.

144.  Finally, Plaintiff informed Defendant Nagi that she will be filing a Title IX and VII complaint in order to report the harassment and defamation she has experienced.

145.  Defendant Nagi coerced, intimidated, and interfered with the Plaintiffs attempt to file the Title IX complaint and instead filed a false allegation against the Plaintiff, accusing her of inappropriate relationship with her director.

146.  Defendant Nagi used his power as the interim superintendent to target and retaliate against the Plaintiff because of a fallout he had with the HR Director, and to try to coerce and intimidate the School Board President, who was the Plaintiff's cousin.

147.  Defendant Nagi filed and published false to slander, defame and put Plaintiff in a false light.

148.  Defendant Nagi published and continued to circulate the remarks to third parties with knowledge of the falsity of the statements or in reckless disregard of their truth or falsity.

149.  Defendant Nagi, with the help of HPS created a false investigation of Plaintiff instead of stopping Defendant Nagi's violations and retaliations.

150.  The retaliatory investigation put in motion by Defendant Nagi and HPS, created a hostile work environment, sexual harassment, and retaliation against Plaintiff.

151.  The retaliatory investigation was aimed to continue to flame the false rumors of an inappropriate relationship attacking Plaintiff's Chasity, integrity, and honor.

152. HPS allowed their agents to spread the rumors designed to slander and hurt Plaintiff by Defendant Nagi. Defendant Nagi, with the assistance of his secretary Janell Meyers, spread slanderous statements about Plaintiff, including false allegations that Plaintiff was engaged in an extramarital affair with a fellow employee. These statements were communicated to multiple third parties within HPS and caused significant harm to Plaintiff's reputation, particularly within her religious and cultural community. Defendant Nagi and his inner cabinet created an environment that encouraged the rumors and false allegations.

153. Leveraging his position as Interim Superintendent, Defendant Nagi initiated a retaliatory investigation against Plaintiff on October 17, 2022, by falsely accusing her of accessing confidential personnel files without authorization and using this information for personal gain. Nagi directed the HPS legal counsel to begin this investigation, framing it as a response to supposed ethical violations by Plaintiff, despite having no credible evidence. This investigation was part of a broader strategy to discredit Plaintiff and retaliate against her for her prior complaints about discriminatory practices within the school district."

154. Defendant Nagi made statements which were false in some material respect which were communicated to third person by word which harmed Plaintiff's reputation and knowingly attempted to put her in physical harm's way.

155. Defendant Nagi's disclosure to the general public, information that was highly objectionable to a reasonable person, which attributed to Plaintiff characteristics, conduct, or beliefs that were false.

156. Defendant Nagi's disclosures placed Plaintiff in a false light.

157. Defendant Nagi had knowledge of or acted in reckless disregard as to the falsity of the disclosed information and the false light in which the Plaintiff would be placed.

158.   As a direct and proximate cause of Defendants' unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, torment, humiliation and embarrassment, constant paranoia of being watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and owing at the time of trial, in addition to compensatory damages, plus court costs, statutory interest and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT V
## PUBLIC POLICY VIOLATION

159.   Plaintiff hereinafter incorporates all of the above referenced allegations as though fully set forth herein.

160.   Plaintiff was retaliated against and subjected to adverse employment actions, by Defendants actions, and disparate treatment, as a result of trying to enforce laws designed to stop harassment, retaliation, discrimination, civil rights, including but not limited unethical hiring practices, and other unlawful employment practices and other behavior in violation of the Elliot Larsen Civil Rights Act.

161.   Defendant, through its agents, servants, or employees, violated the **public policy** of the State of Michigan, specifically:

a. Michigan law provides parents with several rights regarding the school content used to educate their children. These rights are enshrined in various statutes and supported by case law. Under Michigan Compiled Laws § 380. 10, parents and legal guardians have the natural, fundamental right to determine and direct the care, teaching, and education of their children. This statute emphasizes the cooperation between public schools and parents to develop the pupil's intellectual capabilities and vocational skills in a safe and positive environment <u>§ 380.10. Rights of parents and legal guardians; duties of public schools.</u>

b. Additionally, Michigan Compiled Laws § 380. 1137 ensures that parents or legal guardians can review the curriculum, textbooks, and teaching materials of the school in which their child is enrolled. They also have the right to be present to observe instructional activities, subject to reasonable restrictions <u>§ 380.1137. Powers of parents and legal guardians; policies or guidelines.</u>. Furthermore, Michigan Compiled Laws § 380. 1170 allows parents to excuse their children from classes that conflict with their sincerely held religious beliefs without penalties as to credit or graduation <u>§ 380.1170. Physiology and hygiene; instruction; development of comprehensive health education programs; conflict with religious beliefs.</u>. This provision ensures that parents can opt their children out of specific content that they find objectionable on religious grounds.

c. This provision ensures that parents can opt their children out of specific content that they find objectionable on religious grounds. Case law also supports these statutory rights. For instance, in Ryan v. Ryan, the Michigan Supreme Court recognized the fundamental right of parents regarding the care and custody of their children, which includes making decisions about their education <u>Ryan v. Ryan, 260 Mich. App. 315.</u>

Similarly, in In re Reeder, the court emphasized the limited circumstances under which the state can interfere with the parent-child relationship, reinforcing the parent's right to direct their child's upbringing and education <u>In re Reeder, 2013 Mich. App. LEXIS 1719</u>. In summary, Michigan law provides robust protections for parents to have a say in the educational content their children are exposed to, ensuring that their fundamental rights are respected and upheld by the educational system.

162. Plaintiff refused to violate these policies and reported the actions of certain agents, servants, or employees of Defendant to Defendant's upper management. Plaintiff raised concerns that parents must be informed and participate in the selection of books which in Plaintiff's opinion were pornographic in nature.

163. Defendant discharged Plaintiff in whole or in part for refusing or failing to violate the **public policy** of the State of Michigan, as specified above., and for reporting the actions of the agents, servants, or employees of Defendant to Defendant's upper management.

164. As a direct and proximate result of Plaintiff's refusal to breach the **public policy** of the State of Michigan and reporting the breach to Defendant's upper management and as a result of Defendant's retaliatory discharge of Plaintiff, Plaintiff has been placed in financial distress; has suffered loss of wages and benefits, loss of earning capacity, and loss of ability to work; and will suffer these losses in the future.

165. Defendants' actions in retaliating against Plaintiff for attempting to enforce employees' rights under the laws of the State of Michigan and the United States are against public policy and should not be tolerated.

166. The unwelcome conduct perpetuated by Defendants affected a term or condition of employment of the Plaintiff and/or created a hostile work environment.

167.   As a direct and proximate result of the Defendant's unlawful actions, Plaintiff has sustained and continues to sustain injury and damages.

168.   As a direct and proximate cause of Defendants' unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, torment, humiliation and embarrassment, constant paranoia of being watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

   WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and owing at the time of trial, in addition to compensatory damages, plus court costs, statutory interest and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT VI
## EDWARD PLAWECKI EMPLOYEE ACT

169.   Around December 12 ,2022, Plaintiff contacted HPS and requested her personnel records pursuant to the Bullard-Plawecki Employee Right to Know Act, MCL § 423.501, et. seq., in order to obtain their complete personnel records, and any "complaints" and/or "investigations."

170.   MCL §423.510 defines "personnel record" as "a record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action."

171.   Defendants failed to comply and did not provide copies of the entire personnel record, complaints, and investigations.

172.   Plaintiff was forced to file this lawsuit to obtain her personnel records pursuant to MCL § 423.501, et. seq. Desperate to keep the "investigation" away from them, Defendants sought and continue to seek to make false public statements about Plaintiffs with regard to an "investigation" and "violations" while refusing to hand over any evidence thereof.

173.   Defendants have also refused to turn over their investigation into Plaintiff's complaints about discrimination, and retaliation.

174.   As a direct and proximate cause of Defendant Nagi's unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, torment, humiliation and embarrassment, constant paranoia of being watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendant NAGI, in the total amount found to be due and owing at the time of trial, in addition to compensatory damages, plus court costs, statutory interest and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

**COUNT VII**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

175.   Plaintiff hereinafter incorporates all of the above referenced allegations as though fully set forth herein.

176.    The conduct of Defendants, especially Defendant Nagi, was extreme and outrageous in that it exceeded all possible bounds of decency and would be regarded as intolerable in a civilized society.

177.    Between October 2022 and January 2023, Defendant Nagi engaged in a series of deliberate and malicious actions designed to inflict severe emotional distress upon Plaintiff. These actions included, but were not limited to, questioning Plaintiff's integrity, spreading false rumors of an extramarital affair, and threatening Plaintiff with termination without cause. Defendant Nagi knew that Plaintiff was particularly vulnerable due to her familial and religious ties within the community, and he exploited these vulnerabilities to maximize the emotional harm. These actions were extreme, outrageous, and beyond the bounds of decency, causing Plaintiff severe emotional and psychological distress, requiring medical intervention.

178.    Defendants knew they were in violation of state law designed to protect vulnerable female employees when Plaintiff attempted to get them to follow the law and they used unethical, slanderous, and untruthful tactics in retaliation against Plaintiff.

179.    Defendants worked together to threaten Plaintiff by attacking her chastity and accusing her of an affair. Defendants did this through multiple means.

180.    Defendants were aware of the investigation that concluded Plaintiff did nothing wrong and should be reinstated, but instead Defendants kept reopening investigations and kept attempting to fabricate false claims against Plaintiff.

181.    Defendants manipulated their investigation, attorneys, and staff to target and retaliated against Plaintiff.

182.  Defendants set up a public meeting in April 2024 and they intentionally made Plaintiff attend a public meeting to try and save her job at the same time they made her be in the same room as Defendant Nagi, a person who was already found by HPS to have engaged in gender based hostile statements, using the investigative process as a means of retaliation against Plaintiff, lying to investigators, and knowing that Defendant Nagi was using unlawful surveillance to monitor Plaintiff while at work.

183.  Defendants intended to cause Plaintiff emotional distress, and/or Defendants acted with reckless disregard of the probability that Plaintiff would suffer emotional distress and possible physical harm.

184.  As a result of Defendants' conduct as more fully described above, Plaintiff suffered severe emotional distress that was substantial, and that no reasonable person in a civilized society should be expected to bear, including but not limited to suffering, anguish, fright, horror, nervousness, torment, grief, anxiety, worry, shock, humiliation, and shame.

185.  The conduct of Defendants was a substantial factor in causing Plaintiff's severe emotional distress.

186.  As a direct and proximate cause of Defendants' unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, torment, humiliation and embarrassment, constant paranoia of being watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and owing at the time of trial, in addition to compensatory damages, plus court costs, statutory interest and attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT VIII
## BREACH OF CONTRACT

187. Plaintiff hereinafter incorporates all of the above referenced allegations as though fully set forth herein.

188. Plaintiff has a contract of employment with HPS.

189. Defendants breached the contract terms of employment.

190. Defendants' unlawful conduct which violates state and federal laws is a material breach of the agreement. Defendants breached the employment contract dated July 2022, by failing to provide a safe and non-hostile work environment as explicitly required under Board **Policies 3362 and 4362, which "strictly prohibits harassment of staff" and that of which is also included in the onboarding documentation Plaintiff signed upon beginning employment with HPS, stating, "This would include harassment based on any of the legally protected characteristics, such as sex, race, color; national origin, religion, age, height, weight, marital status, or disability... This would include such activities as stalking and unwelcomed taunting, teasing or intimidation."**

191. This breach includes but is not limited to, failing to address Plaintiff's complaints of harassment, retaliating against her for raising Title IX concerns, and placing her on administrative leave without following the due process. outlined in the onboarding

documentation stating, **"If the complaint relates to the Superintendent, it should be filed directly with the Board President. All complaints will be investigated"**.

192.    Defendants' actions were the proximate cause of Plaintiff's damages.

193.    Plaintiff has suffered consequential damages, reliance damages as a direct and proximate cause of Defendants' unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, humiliation and embarrassment, constant paranoia of being watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and owing at the time of trial, in addition to compensatory damages, plus court costs, statutory interest and attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT IX
## TORTIOUS INTERFERENCE WITH BUSINESS
## RELATIONSHIP/CONTRACT

194.    Plaintiff hereinafter incorporates all of the above referenced allegations as though fully set forth herein.

195.    Plaintiff had a valid and existing business employment relationship with HPS.

196.    Plaintiff has a valid business expectancy with HPS.

197.    Defendant Nagi knew of the existence of a business relationship.

198. Defendant Nagi knew of the existence of substantial business opportunities for Plaintiff with respect to long term employment.

199. Defendant Nagi intentionally interfered with this agreement and opportunities by acting improperly, unlawfully, and unethically.

200. There was no justification for these acts of Defendant HPS and Nagi.

201. Plaintiff Al-Hadwan sent several emails and made many calls to Defendants months prior to being investigated and placed on leave. Defendants failed to respond to all emails and complaints and only pursued a formal investigation after Defendant Nagi submitted complaints against Plaintiff.

202. Defendant Nagi was made aware each time Plaintiff would send a confidential email to the Board regarding a concern and whenever Plaintiff requested the Boards protection from Defendant Nagi. They allowed Defendant Nagi to continue retaliating and spying on Plaintiff in order to try to contrive allegations that would warrant her termination.

203. When Plaintiff's emails were ignored and she received no support from the HPS Board, she made a public speech at a Board meeting regarding the discrimination and harassment infecting the district. During the speech Plaintiff was verbally attacked in a threating demeanor by a member of the audience. Defendants did not escort the individual out of the room to create a safe environment. The belligerent individual was allowed to continue to be present for the duration of the meeting even after the humiliation of Plaintiff and the hostile speech interruption, which is against board policy.

204. Defendants failed to adhere to Board Policy 1662, "The District will offer counseling services to any person found to have been subjected to unlawful harassment, and, where appropriate, the person(s) who committed the unlawful harassment".

205.    This humiliation further created a hostile work environment for Plaintiff because of very publicly not receiving support or protection from the Board.

206.    Plaintiff sent emails to the Defendants pleading for support due to the harassment, intimidation, retaliation, the blocking of Plaintiff being able to access an unbiased Title IX representative or any in-district support, and bullying she was enduring. Defendants ignored every email and complaint.

207.    Defendants never moved forward with an investigation as specifically stated in the Onboarding contracts, "If the complaint relates to the Superintendent, it should be filed directly with the Board President. All complaints will be investigated". Board policy 3362 also states that violations of the Anti-Harassment Policy include, " Disregarding, failing to investigate adequately, or delaying investigation of allegations of harassment, when responsibility for reporting and/or investigating unlawful harassment charges comprises part of one's supervisory duties.

208.    As a result of Defendants unjustified acts, Plaintiff has been damaged.

209.    Plaintiff has suffered consequential damages, reliance damages as a direct and proximate cause of Defendants' unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, humiliation and embarrassment, constant paranoia of being watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and owing at the time of trial, in addition to compensatory damages, plus court costs, statutory interest and attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT X
## TORTIOUS INTERFERENCE WITH BUSINESS CONTRACT

210. Plaintiff hereinafter incorporates all of the above referenced allegations as though fully set forth herein.

211. Plaintiff had a valid and existing contract with HPS.

212. Defendant Nagi knew of the existence of the contract.

213. Defendant Nagi knew of the existence of substantial business opportunities of Plaintiff with respect to long term employment.

214. Defendant Nagi intentionally interfered with this agreement and opportunities by acting improperly, unlawfully, and unethically.

215. There was no justification for these acts of Defendant Nagi.

216. As a result of Defendant Nagi's unjustified acts, Plaintiff has been damaged.

217. Plaintiff has suffered consequential damages, reliance damages as a direct and proximate cause of Defendants' unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, humiliation and embarrassment, constant paranoia of being

watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and owing at the time of trial, in addition to compensatory and/or punitive damages, plus court costs, statutory interest and attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT XI
### VIOLATION OF THE MICHIGAN PERSONS WITH DISABIITY CIVIL RIGHTS ACT (PDCRA), MCL 37.1101 et seq.,

217.   Plaintiff hereinafter incorporates all of the above referenced allegations as though fully set forth herein.

218.   PDCRA prohibits discrimination against people with mental or physical disabilities.

219.   At all times relevant herein, Plaintiff was an employee of Defendant within the meaning of the PDCRA.

220.   At all times relevant herein, Defendant was Plaintiff's employer covered by and within the meaning of the PDCRA.

221.   The PDCRA prohibits retaliation against any person because the person has opposed a violation of law under the PDCRA, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under the PDCRA.

222.   Plaintiff engaged in an activity protected under the PDCRA when she reported the discriminatory conduct, retaliation, and hostile environment to which she reported her concerns about students with disabilities being cheated out of a proper education.

223. After Plaintiff raised concerns about HPS violating rules and laws designed to protect students with disabilities Defendants retaliated Plaintiff.

224. Plaintiff raised concerns about students with learning disabilities and the need for HPS to follow the rules and laws to ensure a proper education.

225. Defendants discriminated against students with learning disabilities and mental disabilities.

226. Defendants demonstrated a predisposition to discriminate against students with learning disabilities and mental disabilities and refused to take reasonable precautions and accommodations to ensure an adequate education as required by law.

227. After Plaintiff engaged in protective activity as outlined above, when Plaintiff opposed violations under PDCRA, when Plaintiff reported the violations to Defendants, management, and outside authorities.

228. Defendants' adverse employment actions or severe and pervasive retaliatory harassment that Plaintiff endured was the direct result of Plaintiff's protected activity under Act.

229. The termination of employment and slanderous actions meant to discredit and damage Plaintiffs reputation was and adverse employment action.

230. As a direct and proximate cause of Defendants' unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in community, loss of goodwill, harm to her reputation, loss of esteem and standing in the community, loss of privacy, torment, humiliation and embarrassment, loss of peace and security, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and

owing at the time of trial, in addition to compensatory damages, exemplary damages, plus court costs, statutory interest and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

## COUNT XII
## VIOLATION OF CONSTITUTIONAL RIGHTS TO FREE SPEECH AND RELIGION

218.    Plaintiff hereinafter incorporates all of the above referenced allegations as though fully set forth herein.

219.    Plaintiff was retaliated against and subjected to adverse employment actions, by Defendants actions, and disparate treatment, as a result of exercising her free speech and protecting religious beliefs against pornographic content.  Defendants retaliated against Plaintiff to chill or stop her constitutional rights to express her opinion about inappropriate school materials and parental rights to know about what is going on with their kids.

220.    Defendant, through its agents, servants, or employees, violated the Plaintiffs Constitutional protected rights under the Michigan and United States Constitution.

221.    Plaintiff raised concerns that parents must be informed and participate in the selection of books which in Plaintiff's opinion were pornographic in nature.

222.    Defendants worked to advance the free speech and religious position (and anti-religious positions) of the President of the Teachers union and specific teachers who believed in giving teachers autonomy of their students and the power to hide information from parents.

223.    As a direct and proximate result of Plaintiff's excercising her Constitutional Rights Defendants retaliated against Plaintiff and as a result of Defendant's retaliatory discharge of Plaintiff, was wrongfully discharged Plaintiff has been placed in financial distress; has

suffered loss of wages and benefits, loss of earning capacity, and loss of ability to work; and will suffer these losses in the future.

224.    As a direct and proximate result of the Defendant's unlawful actions, Plaintiff has sustained and continues to sustain injury and damages.

225.    As a direct and proximate cause of Defendants' unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, torment, humiliation and embarrassment, constant paranoia of being watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and owing at the time of trial, in addition to compensatory damages, plus court costs, statutory interest and actual attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.


## COUNT XII

## Breach of Implied Employment Contract &Wrongful Discharge

226.    Plaintiff hereinafter incorporates all of the above referenced allegations as though fully set forth herein.

227.    Plaintiff had a valid and existing contract with HPS.

228.    Defendant Nagi knew of the existence of the contract.

229. Defendant Nagi knew of the existence of substantial business opportunities of Plaintiff with respect to long term employment.

230. While Plaintiff was employed by Defendant, management of Defendant's HPS made statements to Plaintiff and to other employees of Defendant that it was Defendant's policy not to **discharge** Plaintiff from Defendant's employment as long as *she* performed *her* job. Such statements consisted of verbal representations made by Defendant Nagi and others that these jobs are for life.

231. Further, while Plaintiff was employed by Defendant, *she* was led to believe that *she* would not be terminated except for good cause. Defendant engaged in a pattern of conduct reinforcing the expectation of job security, such as routinely retaining employees who performed satisfactorily, instituting formal performance plans for underperforming employees, and adhering to a progressive discipline policy.

232. Plaintiff relied on these policies, statements, and representations of Defendant through its agents, servants, or employees. As a result, there was, by express words, implications, or operation of law, a contractual agreement between Plaintiff and Defendant by which Defendant was obligated to terminate Plaintiff's employment only for good cause.

233. Plaintiff performed her duties in accordance with Defendants' expectations and met all performance metrics, thereby satisfying any conditions for continued employment. Plaintiff was never warned of deficiencies in her performance nor provided an opportunity to address alleged issues before her termination.

234. Defendants' termination of Plaintiff's employment violated the implied contractual agreement requiring good cause for termination. No justifiable reason was provided, and Plaintiff was not afford due process or notice.

235. As a result of Defendant's termination of Plaintiff's employment, Defendant has breached the contract described above.

236. As a direct and proximate result of the termination and breach of contract, Plaintiff has been placed in financial distress; has suffered loss of wages and benefits, earning capacity, and ability to work; and will suffer these losses in the future.

237. Plaintiff has suffered consequential damages, reliance damages as a direct and proximate cause of Defendants' unlawful actions, Plaintiff has sustained injuries and damages, including but not limited to: loss of earnings and earning capacity, loss of career opportunities, loss of sense of physical safety in a religiously strict family and community, loss of goodwill, harm to her business reputation, loss of esteem and standing in the community, loss of privacy, humiliation and embarrassment, constant paranoia of being watched and recorded for blackmail, loss of peace and security in marriage, mental and emotional distress, and loss of ordinary pleasures of life.

WHEREFORE, Plaintiff hereby respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff and against Defendants, in the total amount found to be due and owing at the time of trial, in addition to compensatory and/or punitive damages, plus court costs, statutory interest and attorney fees sustained in the case as well as any other further relief as may be deemed appropriate under the circumstances.

DATED: November 19, 2024

Respectfully submitted,

By:    */s/Azzam Elder*
AZZAM ELDER (P53661)
ELDER BRINKMAN, PLLC
Attorneys for Plaintiff
1360 Porter Street, Suite 200
Dearborn, MI 48124
(313) 429-1326 Fax: (313) 202-9548